Rockingham
No. 2001-134

EXETER HOSPITAL MEDICAL STAFF & a.

v.

BOARD OF TRUSTEES OF EXETER HEALTH RESOURCES, INC. & a.

Submitted: July 26, 2002
Opinion Issued: November 14, 2002

*Sulloway & Hollis, P.L.L.C.*, of Concord (*Michel A. LaFond* and *Robert M. Larsen* on the brief), for the petitioners.

*Flygare, Schwarz & Closson, P.L.L.C.*, of Exeter (*Daniel P. Schwarz* on the brief), and *McDermott, Will & Emery*, of Boston, Massachusetts (*Steven W. Kasten* and *Jennifer S. Geetter* on the brief), for the respondents.

*Rath, Young and Pignatelli, P.A.*, of Concord (*Lucy C. Hodder* on the brief), for the American Medical Association and the New Hampshire Medical Society, as *amici curiae.*

*Wadleigh, Starr & Peters, P.L.L.C.*, of Manchester (*Eugene M. Van Loan III* on the brief), for the American Hospital Association and the New Hampshire Hospital Association, as *amici curiae.*

*Sanders & McDermott, P.L.L.C.*, of Hampton (*Wilfred L. Sanders, Jr.* on the brief), for intervenor Alain Ades, M.D.

*Kamensky & Rubinstein,* of Lincolnwood, Illinois (*Miles J. Zaremski*), and *Maxwell J. Mehlman* of Cleveland, Ohio, for the American College of Legal Medicine, as *amicus curiae,* adopted the brief of the American Medical Association and the New Hampshire Medical Society.

DUGGAN, J. The petitioners, Dr. Mark Windt and the Exeter Hospital medical staff (medical staff), appeal the orders of the Superior Court (*Coffey,* J.) granting the respondents' motions to dismiss. We affirm in part, vacate in part and remand.

The dispute in this case arose when the respondents, the boards of trustees of Exeter Hospital, Inc. and Exeter Health Resources, Inc. (boards), removed Dr. Windt from the boards. Upon being elected to a two-year term as medical staff president beginning January 1, 2000, Dr. Windt became an *ex officio* member of the boards. Board members are subject to removal with or without cause and must sign an acknowledgement of the boards' confidentiality policy, which provides that "members of the Board of Trustees shall maintain the confidentiality of matters considered at meetings of the Board of Trustees, including any materials distributed at or prior to such meetings that pertain to deliberations of the Board."

In May 2000, the executive committees of the boards advised Dr. Windt that a meeting was scheduled to consider whether to remove him as a trustee and presented him with a notice of proposed removal outlining the allegations against him. On June 2, 2000, Dr. Windt received a notice of removal, which informed him that he had been removed from the boards and which contained the following "gag order":

> All information concerning EHR [Exeter Health Resources, Inc.], the Hospital, or any of their affiliated organizations which you have received in your capacity as a Trustee, President of the Medical Staff, or otherwise, including but not limited to all information concerning or relating to the fact and processes of [your] removals and the reasons therefore, is and shall remain strictly confidential and may not be disclosed to any person without the respective Boards' prior written consent. You should be strongly advised the EHR and the Hospital will use all available legal methods to protect their interests with regard to any actual or threatened breach of this confidentiality obligation or other misuse of any such material or information.

The boards informed members of the medical staff that no information regarding Dr. Windt's removal would be given to them unless they also signed confidentiality agreements.

In August 2000, Dr. Windt, the medical staff and its executive committee filed a petition in equity, challenging the "gag order." Specifically, they requested the following relief:

    a) declare the right of the Petitioner, Dr. Windt, to disclose the Notice of Removal and to discuss the circumstances associated therewith with the Medical Staff, without threat of recourse;

    b) declare the right of Petitioner, Dr. Windt, to access to information, documents and Hospital personnel reasonably required to permit Dr. Windt to prepare a comprehensive response to the allegations included in the Notice of Proposed Removal;

    c) declare the right of the Petitioner, the Executive Committee, to disclose and cause a discussion on the Notice of Removal and the circumstances associated therewith with the Medical Staff, without threat of recourse;

    d) declare the right of the Petitioner, the Medical Staff, to discuss the termination of Dr. Windt, his response thereto, and to take appropriate action to protect self-governance of the Medical Staff and the delivery of quality care to patients at Exeter Hospital;

    e) prohibit the Boards from instituting legal action against any person or entity for retaining counsel or for disclosing information sought to be prohibited by the Boards' Notice of Decision;

    f) schedule an expedited briefing and hearing schedule on this matter;

    g) grant the Petitioners their costs and attorneys' fees associated with this Petition;

    h) retain jurisdiction over this matter; and

    i) grant such other relief as may be just.

The boards moved to dismiss, claiming that Dr. Windt and the medical staff lack standing and legal capacity to sue. The court denied the motion as to Dr. Windt but granted the motion as to the medical staff and its executive committee, ruling that "the medical staff is not an unincorporated association with the capacity to sue or be sued."

Proceeding with the petition, Dr. Windt commenced discovery, to which the boards objected, alleging that discovery was an element of the ultimate relief requested. Dr. Windt then moved to compel responses to his discovery requests, and, simultaneously, for an expedited hearing, noting that the medical staff had called a special meeting for November 29, 2000, to consider a proposal to recall him from his position as president.

After a hearing on November 21, 2000, the superior court ordered the boards to produce the requested discovery and modified the "gag order" to allow Dr. Windt to discuss the reasons for his removal from the boards with the medical staff who either signed the confidentiality agreement or attended the November 29 medical staff meeting.

In December 2000, the boards filed a motion to dismiss, asserting that Dr. Windt's claims had become moot by the November 2000 court order. Before the court ruled on the motion, Dr. Windt filed a second petition in equity against the boards, challenging his removal from the boards. With respect to the original petition, the court granted the boards' motion to dismiss for mootness and denied Dr. Windt's subsequent motion for reconsideration. The second petition was ultimately voluntarily dismissed with prejudice based upon a stipulation between the parties and is not subject to this appeal.

On appeal, Dr. Windt and the medical staff argue that the superior court erred in: (1) refusing to accord standing to the medical staff; (2) dismissing Dr. Windt's petition in equity as moot; and (3) allowing the "gag order" to remain unmodified when the boards filed an affidavit identifying the allegations against Dr. Windt and other information covered by the "gag order."

We turn first to whether the medical staff can bring suit against the boards. The plaintiff bears the burden of sufficiently demonstrating a right to claim relief. *See Ossipee Auto Parts v. Ossipee Planning Board*, 134 N.H. 401, 403-04 (1991). Because "[a]ctions may be brought only by legal entities," 59 AM. JUR. 2D *Parties* § 24 (2002), we must decide whether the medical staff is a legal entity. The petitioners argue that it is an unincorporated association or, in the alternative, a voluntary association. The petitioners, however, do not distinguish an "unincorporated association" from a "voluntary association." Thus, we treat the two alike.

We assume, without deciding, that New Hampshire recognizes an unincorporated association as a legal entity with the capacity to sue. *But see* 6 AM. JUR. 2D *Associations and Clubs* § 51 (1999) (as a general rule, an unincorporated association cannot sue or be sued in the organization's own name without an enabling or permissive statute or rule of practice). An unincorporated association is "[g]enerally created and formed by the

voluntary action of a number of individuals in associating themselves together under a common name for the accomplishment of some lawful purpose." *Peoples Gas System v. Acme Gas Corp.*, 689 So. 2d 292, 298 n.8 (Fla. Dist. Ct. App. 1997) (quotations omitted). "It is the nature of an organization, rather than its name, which makes it an [unincorporated] association in the eyes of the law." 6 AM. JUR. 2D *Associations and Clubs* § 1. Among other things, unincorporated associations typically adopt, interpret and administer their own rules, regulations and bylaws, thereby promulgating internal policy and disciplinary procedures for their members. *Id.* § 5.

We conclude that the medical staff in this case is not a legal entity separate and apart from the hospital, but rather is a subordinate administrative unit dependent upon and accountable to the hospital. Hospital licensure regulations, promulgated by the New Hampshire Department of Health and Human Services, the Exeter Hospital (hospital) bylaws and the medical staff bylaws reflect that the medical staff serves under the authority of the hospital board of trustees. *See* N.H. ADMIN. RULES, He-P 802.02 (effective June 22, 1994; expired June 22, 2000). We note that although the department of health and human services regulations have expired, neither party disputes their applicability, and both cite to them to explain the hospital organization and administration. Because the regulations are not necessary for the outcome of this case, we rely on them only to assist in understanding the relationship between the hospital and the medical staff.

New Hampshire Administrative Rule He-P 802.02(a) provided that, as a condition of licensure, each hospital must have a governing body responsible for, among other things: "[m]anagement and control of the operation of the hospital; ... [a]doption of hospital by-laws defining responsibilities for the operation of the general hospital, and establishment of a medical staff ... ; [and] ... determination of the qualifications for appointment for all managers, medical staff and staff." The regulations additionally directed the medical staff to "[d]evelop ... medical staff bylaws and policies in conjunction with the governing body which shall establish a mechanism for self governance by the medical staff and accountability to the governing body." N.H. ADMIN. RULES, He-P 802.02(d)(2). The regulations granted the governing body final approval of the medical staff bylaws. N.H. ADMIN. RULES, He-P 802.02(a)(5).

Consistent with these regulations, the bylaws of both the hospital and the medical staff vest responsibility and authority for the hospital operation with the hospital board of trustees. As the governing body, the board of trustees appoints the medical staff, delegates responsibility to it,

and "oversee[s] its organization into a responsible administrative unit." The board retains ultimate authority to approve or deny requests for clinical privileges and recommendations to revoke, suspend or condition clinical privileges already granted. Although the medical staff develops and adopts bylaws, rules and regulations, it is required to submit them to the governing body for approval, and the governing body reserves the right to unilaterally adopt or amend them as necessary.

We glean from the applicable regulations and bylaws that, although the medical staff is an important component of the hospital, it "emerges not as a separate entity but as part of the legally constituted hospital corporation, having been created by the governing board." *Johnson v. Misericordia Community Hospital*, 294 N.W.2d 501, 507 (Wis. Ct. App. 1980), *aff'd*, 301 N.W.2d 156 (Wis. 1981). Despite the mechanisms for limited self-governance built into the regulations and bylaws, the medical staff lacks independence and autonomy and is ultimately accountable to the hospital board of trustees. We therefore conclude that

> [t]he medical staff has no legal life of its own and is merely one component of the hospital corporation. This in no way denigrates the role which the staff plays in the modern hospital. It is, in fact, the single most important department in the hospital. But the fact that it is a "department" means that the staff cannot sue or be sued as a body.

Horty & Mulholland, *The Legal Status of the Hospital Medical Staff*, 22 ST. LOUIS U. L.J. 485, 499 (1978) (quotations omitted); *cf. Ramey v. Hospital Authority of Habersham County*, 462 S.E.2d 787, 788 (Ga. App. Ct. 1995), *cert. denied* (1996) (holding that medical staff is not separate, independent entity capable of being sued independently of the hospital). *But see St. John's Hosp. M. S. v. St. John Reg. M. C.*, 245 N.W.2d 472, 474 (S.D. 1976) (assuming that medical staff is an unincorporated association and therefore concluding that it is a proper party to bring suit); *cf. Corleto v. Shore Memorial Hospital*, 350 A.2d 534, 539 (N.J. Super. Ct. Law Div. 1975) (concluding that medical staff is amenable to suit as an unincorporated association). Accordingly, we affirm the trial court's ruling that the medical staff lacks status under the law to sue as a separate entity.

The petitioners further argue that the medical staff should be accorded standing because recognition and protection of its existence, functions and self-governance are required by New Hampshire public policy and because the boards' actions have directly and adversely affected the medical staff,

which has a direct and substantial interest in the outcome of the litigation. Whether the medical staff can maintain an action against the boards turns upon its status under the law. Having concluded that the medical staff is not a legal entity, we need not address these policy arguments.

We next turn to whether the trial court erred in dismissing Dr. Windt's petition as moot. The question of mootness is one of convenience and discretion and is not subject to hard-and-fast rules. *Petition of Thayer*, 145 N.H. 177, 182 (2000). We generally will refuse to review a question that no longer presents a justiciable controversy because issues involved have become academic or dead, but may review a question that has become moot if it involves a significant constitutional question or an issue of significant public concern. *Id.*

The trial court based its dismissal for mootness on its November 2000 order. After a hearing on Dr. Windt's motions to compel responses to his discovery requests and for an expedited hearing, the court ordered the boards to produce the requested discovery and modified the "gag order." The modification to the "gag order" was limited to allowing Dr. Windt to discuss the reasons for his removal from the boards with the medical staff who either signed a confidentiality agreement with the boards or attended a medical staff meeting on November 29, 2000, convened to discuss whether to recall Dr. Windt from his position as president.

We conclude that the issues presented in the original petition were not rendered moot by the November 2000 order. Essentially what Dr. Windt received from that order was a limited opportunity to discuss his removal from the boards. Looking at the original petition, it appears that Dr. Windt was seeking the unfettered ability to discuss the issue, which he was not granted.

The boards contend that because Dr. Windt's two petitions were "arguably identical," the court's dismissal of the original petition "was effectively a case management order" and was therefore proper. We disagree. The trial court granted the motion to dismiss for mootness because "all of the substantive relief which Dr. Windt requested in his petition has been furnished in the Court's November 22, 2000 order." The court's order does not mention anything about case management or the effect of the second action upon the first. Additionally, the boards contend that there are "further complications" which support affirming the superior court's order; namely, that Dr. Windt's term as president of the medical staff has expired and that the voluntary dismissal of the second petition with prejudice has the preclusive effect of barring further relief to Dr. Windt. The boards, however, fail to explain why the expiration of Dr.

Windt's term renders moot his requests for relief or why dismissal of the second petition would bar further relief. Because these arguments have not been considered below, we decline to address them for the first time on appeal. The boards may raise these issues on remand.

In light of our holding that Dr. Windt's petition is not moot, we need not address the petitioners' final argument alleging that the boards waived confidentiality of the information covered by the "gag order."

*Affirmed in part; vacated in part; remanded.*

DALIANIS, J., concurred; BARRY, J., superior court justice, and GRAY and MANIAS, JJ., retired superior court justices, specially assigned under RSA 490:3, concurred.